**Joseph PANE, Appellant,**

v.

**RCA CORPORATION, Appellee.**

**Nos. 88–5758, 88–5872.**

United States Court of Appeals,
Third Circuit.

Argued Jan. 26, 1989.

Decided Feb. 28, 1989.

Rehearing and Rehearing In Banc
Denied April 3, 1989.

Rapp, White, Janssen & German, Ltd., Henry H. Janssen (argued), Tanya M. Sweet, Philadelphia, Pa., for appellant, Joseph Pane.

Mark S. Dichter (argued), Michael L. Banks, and Janet Y. Gadient, Philadelphia, Pa., for appellee RCA Corp. (Morgan, Lewis & Bockius, of counsel).

Before GIBBONS, Chief Judge, SEITZ and GREENBERG, Circuit Judges.

## OPINION OF THE COURT

GIBBONS, Chief Judge:

Joseph Pane, an employee of RCA Corporation (RCA) appeals from a judgment in favor of RCA in his suit under the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001 *et seq.* and New Jersey common law. In that suit Pane claims that RCA denied him a severance agreement awarded to many of its corporate managers, discriminated against him to prevent his eligibility for such an agreement, and retaliated against him because of his efforts to secure it. The district court rejected Pane's demand for a jury trial, and rejected his claims. We will affirm.

### I.

Pane, who is fifty-nine years old, is currently employed by RCA as Director of Special Programs. In 1985, he was division vice president and general manager of RCA's government volume production. Late in 1985, RCA learned that General Electric Company (GE) was considering making a tender offer for RCA's shares. At a special meeting of RCA's board of directors on December 8, 1985, its attorney advised the board that if a merger agreement was reached consummation of the merger would take at least nine months. Since after a merger some RCA executives might become superfluous, uncertainty about executives' employment future could have devastating effects on RCA's operations. To prevent the loss of key personnel during the transitional phase, the attorney recommended that the board authorize employment agreements and severance agreements to a small group of executives. He then reviewed the terms of the proposed agreements, and informed the board that RCA's president and chief executive officer, Robert Frederick, had identified certain individuals and categories of executives whom he would recommend be of-fered severance agreements if the board authorized them. The board authorized negotiations with GE, authorized employment agreements for some executives,[1] and adopted the following resolution regarding severance agreements:

RESOLVED, that it is advisable and in the best interests of the Corporation and its shareholders that the Corporation enter into severance agreements (the "Severance Agreements") with certain executives of the Corporation, substantially in the form presented and described to this Meeting and with the categories of persons described to this Meeting, and that the Chairman of the Board, the President and Chief Executive Officer and any Senior Vice President of the Corporation be, and each of them hereby is, authorized to execute and deliver the Severance Agreements, with such changes or amendments as any such person may deem necessary or advisable, the execution of any Severance Agreement or any amendment thereto conclusively to evidence due authorization thereof by the Board of Directors.

App. 2014. Pane's name was on the list of possible severance agreement candidates which Frederick had on December 8.

The board took no specific action with respect to that list. On December 9, 1985, Frederick met with RCA's senior vice president of employee relations to review the severance agreement list. Eight names were eliminated and nine names added. Pane's name was still on the December 9 list.

On December 11, 1985, the board convened again to consider a proposed merger agreement with GE, which was approved. Each director was given a revised form of severance agreement and a list of executives to be offered such agreement. Pane's name was on the list. The board took the following action:

RESOLVED, that it is advisable and in the best interests of the Corporation and its stockholders that the Corporation enter into severance agreements (the "Severance Agreements") with certain execu-

---

1. Pane does not contend he is entitled to an employment agreement.

tives of the Corporation as described to this Meeting, such agreements to be substantially in the form of the agreement presented to the Board of Directors and described to the Board at this Meeting, and that the Chairman of the Board, the President and Chief Executive Officer and any Senior Vice President of the Corporation be, and each of them hereby is, authorized to execute and deliver the Severance Agreements, with such changes as any such person may deem necessary or advisable, the execution of the Severance Agreements or any amendments thereto conclusively to evidence due authorization thereof by the Board of Directors.

App. 2035. Thereafter Frederick executed a form of the severance agreement for each executive on the list. The executed copy in Pane's name was never delivered to him.

On December 13, 1985, Pane attended a staff meeting of the RCA Aerospace and Defense Division at which John Rittenhouse, RCA's executive vice president explained and discussed the severance agreements. At the conclusion of this meeting, Donald Gillis, RCA's staff vice president of employee relations for Aerospace and Defense, met separately with Rittenhouse and suggested that Pane not receive a severance agreement. RCA contends, and Pane disputes, that the reason for Gillis' recommendation was a decision made before the merger talks with GE, that Pane was to be replaced as the manager of government volume production.

On December 27, 1985, Pane received from RCA a letter signed by its senior vice president and general counsel, Samuel Murphy, Jr., stating that the blank in a line in the December 11, 1985 severance agreement should be filled in with the name General Electric Company. The accompanying memorandum from a senior vice president administering the severance agreements stated that Murphy's letter "should be filed with the Limited Severance Agreement recently provided to you." App. 33. No such agreement had been provided to Pane. Additionally, on December 26, 1985, Pane received a three-page memorandum addressed to "Limited Severance Plan Participants" describing how such participants could increase the value of their severance payments by exercising any available stock options they held by the end of the year.

Pane exercised his RCA stock options, purchasing 234 shares at $37.875/share. He paid for the stock with the proceeds of a loan arranged by RCA from Bankers Trust Company. RCA reimbursed Pane for all interest expenses incurred in connection with this loan. The exercise of the option resulted in a gain for Pane of over $6,500. Pane, in fact, was never given a severance agreement.

Pane was later demoted from the position of general manager of RCA's government volume production to his present position.

## II.

Pane filed a complaint alleging that RCA's severance agreements are an employee benefit plan within the meaning of ERISA and that its withholding of such an agreement from him violated section 510, 29 U.S.C. § 1140. He also pleaded state law claims for breach of contract (promissory estoppel), breach of covenants of good faith and fair dealing, and intentional infliction of emotional distress. He sought compensatory and punitive damages. The complaint contains a demand for jury trial. RCA moved to dismiss Pane's state law claims and his claim for punitive damages, and to strike his demand for a jury trial. These motions were granted on August 11, 1987. 667 F.Supp. 168 (D.N.J.1987).

Thereafter both Pane and RCA moved for summary judgment on Pane's ERISA claim. Those motions were denied on March 2, 1988. A non-jury trial was held, and the court rendered a lengthy opinion finding no cause for action. Judgment in favor of RCA was entered on September 22, 1988. This appeal followed.

## III.

The district court dismissed Pane's New Jersey law claims, including his claim for

punitive damages, on the ground that those claims are preempted by ERISA. Pane contends that this ruling was error. His argument in this respect is inconsistent with his reliance on ERISA as a basis for federal question jurisdiction. To support such jurisdiction he alleges that the severance agreements are an employee benefit plan under ERISA.

■ Section 514(a) of ERISA provides that it "shall supersede any and all state laws insofar as they may now or hereafter relate to any employee benefit plan." 29 U.S.C. § 1144(a) (1982). The term "relate to" has been construed broadly. "A law 'relates to' an employee benefit plan, in the normal sense of the phrase, if it has a connection with or reference to such a plan." *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96–97, 103 S.Ct. 2890, 2899–2900, 77 L.Ed.2d 490 (1983). *See also Pilot Life Ins. v. Dedeaux*, 481 U.S. 41, 107 S.Ct. 1549, 1553, 95 L.Ed.2d 39 (1987); *Metropolitan Life Ins. Co. v. Taylor*, 481 U.S. 58, 482 U.S. 1, 107 S.Ct. 1542, 1547, 95 L.Ed.2d 55 (1987). The term "employee benefit plan" was considered in *Fort Halifax Packing Co., Inc. v. Coyne*, 482 U.S. 1, 107 S.Ct. 2211, 96 L.Ed.2d 1 (1987). The Court determined that a lump sum payment, triggered by a single event, requiring no administrative scheme, was not an employee benefit plan for ERISA. Negatively, *Fort Halifax Packing* suggests that RCA's plan for awarding severance agreements to certain key executives is such a plan. It came into being on December 8, 1985, when RCA's board of directors authorized the concept and RCA's management identified a potential class of participants. It required an administrative scheme. Thus the Court correctly held that the plan for awarding severance agreements is an ERISA employee benefit plan.

■ The remaining question is whether the three state law counts which were stricken have a connection with or reference to such plan. Count II alleges a breach of contract in not including Pane in the plan. Count III alleges he was included, and the plan agreement was breached. These counts simply contend that state law and ERISA co-exist for purposes of enforcement of the plan. Section 514(a) of ERISA says otherwise. Count IV charges RCA with intentional infliction of emotional distress by refusing to grant his severance benefits, and retaliation against him, causing such distress, for seeking those benefits. State law claims of emotional distress arising out of the administration of an ERISA employee benefit plan are also preempted. *Howard v. Parisian, Inc.*, 807 F.2d 1560 (11th Cir.1987); *Powell v. Chesapeake & Potomac Tel. Co.*, 780 F.2d 419 (4th Cir.1985), *cert. denied*, 476 U.S. 1170, 106 S.Ct. 2892, 90 L.Ed.2d 980 (1986). Furthermore, to the extent that these state law claims would support an award of punitive damages, the claim for such relief is also preempted.[2]

The court did not err, therefore, in granting RCA's motion to dismiss Pane's state law claims.

### IV.

■ With the state law claims out of the case the district court struck Pane's demand for a jury trial on the remaining ERISA count. Pane contends that this ruling was error. He asserts that the question he raises is one of constitutional dimensions because of the guarantee in the seventh amendment of the right to a jury trial in actions at law. We think the question is more focused. Essentially it involves an issue of statutory interpretation; what kind of remedy did Congress intend to afford for plan participants or beneficiaries. A legal remedy would result in a

---

**2.** Punitive damages are not available under Pane's federal claim. It has been consistently held that section 502(a) of ERISA, 29 U.S.C. § 1132(a) does not authorize such relief. *See Kleinhans v. Lisle Savings Profit Sharing Trust*, 810 F.2d 618, 621 (7th Cir.1987); *Sokol v. Bernstein*, 803 F.2d 532, 538 (9th Cir.1986); *Dedeaux v. Pilot Life Ins. Co.*, 770 F.2d 1311, 1313 n. 3 (5th Cir.1985), *rev'd on other grounds*, 481 U.S. 41, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987); *Dependahl v. Falstaff Brewing Corp.*, 653 F.2d 1208, 1216 (8th Cir.), *cert. denied*, 454 U.S. 968, 102 S.Ct. 512, 70 L.Ed.2d 384 (1981).

money judgment enforceable only by execution, or other conventional common law process such as ejectment or replevin. An equitable remedy would result in a judgment enforceable in personam and by contempt. If Congress in establishing a new cause of action opts for equitable remedies enforceable by contempt, the seventh amendment does not apply. Thus we turn to the statute which in the relevant part of section 502 reads:

A civil action may be brought—

(1) by a participant or beneficiary—

 (A) for the relief provided for in subsection (c) of this section, or

 (B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan;

* * * * * *

(3) by a participant [or] beneficiary ... (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations, or (ii) to enforce any provisions of this subchapter or the terms of the plan.

29 U.S.C. § 1132(a) (1982). Section 502(a) thus authorizes three separate categories of causes of action.

Those causes of action authorized by section 502(a)(3) are by its terms explicitly equitable, and we have held that there is no right to a jury trial for them. *Cox v. Keystone Carbon Co.*, 861 F.2d 390 (3d Cir.1988).

Those causes of action authorized by section 502(a)(1)(B) are not explicitly denominated as equitable. In *Turner v. CF & I Steel Corp.*, 770 F.2d 43, 48 (3d Cir.1985), however, we held that the section 502(a)(1)(B) cause of action for the recovery of benefits was equitable in nature. In so holding, we joined other courts of appeals which had previously rejected the claim that in a suit for the recovery of benefits

under an ERISA employee benefit plan a litigant was entitled to a jury trial. *Berry v. Ciba–Geigy Corp.*, 761 F.2d 1003, 1007 (4th Cir.1985); *Blau v. Del Monte Corp.*, 748 F.2d 1348, 1357 (9th Cir.1984); *Katsaros v. Cody*, 744 F.2d 270, 278 (2d Cir.), *cert. denied*, 469 U.S. 1072, 105 S.Ct. 565, 83 L.Ed.2d 506 (1984); *In re Vorpahl*, 695 F.2d 318, 319 (8th Cir.1982); *Calamia v. Spivey*, 632 F.2d 1235, 1237 (5th Cir.1980); *Wardle v. Central States Pension Fund*, 627 F.2d 820 (7th Cir.1980), *cert. denied*, 449 U.S. 1112, 101 S.Ct. 922, 66 L.Ed.2d 841 (1981). Since *Turner*, one of those courts has reiterated this holding. *Nevill v. Shell Oil Co.*, 835 F.2d 209, 213 (9th Cir.1987). Another court of appeals has endorsed it. *Howard v. Parisian, Inc.*, 807 F.2d 1560, 1567 (11th Cir.1987). Pane urges that these authorities, *Turner* especially, are distinguishable because in this instance his claim is against his employer and not against a separate trust fund. In fact, however, the *Turner* suit was against an employer for benefits in excess of those provided by a funded plan. Thus the *Turner* suit, like this one, sought to impose liability on an employer, not simply a separate fund. Thus *Turner* is directly on point and controlling.[3]

The third category of cause of action is that authorized in section 502(a)(1)(A) for the relief provided in subsection (c). This relief involves the furnishing of information; a form of relief for which there is no counterpart at common law. Pane refers us to the $100/day penalty which the court may in its discretion impose. 29 U.S.C. § 1132(c) (1982). It is clear, however, that this penalty provision is entirely ancillary to the informational purpose of the subsection. Its purpose is similar to that of a coercive civil contempt penalty. Its application, consistent with that purpose, is discretionary with the court. Even more clearly than with the causes of action authorized by section 502(a)(1)(B), those authorized in sec-

---

**3.** Pane's reliance on *Haeffele v. Hercules Inc.*, 839 F.2d 952, 957 (3d Cir.1988), is misplaced. That case involved the reversal of a grant of summary judgment because of the existence of disputed fact issues. The reference to inferences which a jury might find was an infelicitous shorthand way of referring to what a trier of the facts might find.

tion 502(a)(1)(A) are equitable, not legal, in nature.

Pane also relies on section 510, 29 U.S.C. § 1140, which provides that it is unlawful to retaliate against a participant or beneficiary for the exercise of rights under an employee benefit plan. That section, which lays down a standard of conduct, is enforceable pursuant to section 502(a)(2). *Gavalik v. Continental Can Co.*, 812 F.2d 834, 843 (3d Cir.1987). Section 502(a)(2) simply refers to "appropriate relief under section 1109" [409], and there is no reason to attribute to Congress an intention, inconsistent with the rest of section 502(a), to authorize legal rather than equitable relief.

We conclude, therefore, that the trial court did not err in striking Pane's demand for a jury trial on his section 502(a) ERISA claims.

### V.

Pane challenges the district court's disposition of his ERISA claims on several grounds.

### A.

#### Applicability of Section 401(a)(1)

■ The district court assessed RCA's liability in accordance with the standards of ERISA section 401(a)(1), 29 U.S.C. § 1101(a)(1). That section governs "a plan which is unfunded and is maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees." *Id.* Section 401(a)(1) plans are not subject to the funding, participation, vesting or fiduciary standards applicable to other employee benefit plans. They do not have to be established and maintained pursuant to a written instrument. Such plans are not managed by fiduciaries and involve no fiduciary obligations of plan administrators toward plan participation. *See Barrowclough v. Kidder, Peabody & Co.*, 752 F.2d 923 (3d Cir. 1985).

Pane stipulated that RCA's severance plan was unfunded. The record establishes that it provided severance compensation, a form of deferred compensation, to a select group of sixty-one management employees out of a work force exceeding 80,000 persons; less than one-tenth of one percent of that work force. Clearly this plan was maintained "primarily" for the section 401(a)(1) statutory purpose, whether one interprets the word "purpose" as a reference to the reason for its adoption, or to the type of benefits provided, or to the selectness of the group of employees designated.

■ Pane urges, however, that the district court should not have applied section 401(a)(1) standards because RCA did not plead that section as an affirmative defense. He contends that since section 401(a)(1) provides for an exemption from ERISA provisions otherwise applicable, it must be an affirmative defense, waived if not pleaded. We reject this contention. Section 401(a)(1) does not provide for an exemption from liability under section 502(a). It merely provides the legal standard by which RCA's section 502(a) liability is to be determined. Moreover, even if section 401(a)(1) were construed to be an affirmative defense, we could not find that the trial court abused its discretion in litigating it, since the section was referred to repeatedly in pretrial motions, and no unfair surprise resulted. *See* Fed.R.Civ.P. 15(b).

Thus we hold that the trial court properly applied section 401(a)(1) as the measure of RCA's ERISA obligations.

### B.

#### Pane is Not a Participant

■ The district court found that Pane was not a participant in RCA's severance agreement plan. Analyzing the circumstances surrounding its adoption, the court concluded that the board, on December 8, 1985, considered the list of executives to be given severance agreements preliminary only. In reaching this conclusion the court credited Mr. Frederick's testimony to this effect. The court also construed the December 11, 1985 resolution as authorizing management to make changes in the list

which was presented to the board on that date. In making that finding, the court credited Mr. Frederick's testimony that at the December 11 meeting there was only a de minimus discussion of the severance agreements. The limited discussion suggested an interpretation of the resolution, consistent with its text, that management had discretion to decide which RCA executives would be included. That interpretation, the court found, was consistent with the actions of Mr. Frederick and Mr. Scanlon, and with their testimony.

As to the December 13, 1985 meeting, the court credited the testimony of RCA witnesses that Pane was not on that date given a severance agreement. This finding involves a credibility determination. Fed. R.Civ.P. 52(a).

Pane contends that the trial court's recognition of management discretion as to plan coverage violates the parol evidence rule. There is no such violation. The only written documents which can be identified as part of the plan are the December 11, 1985 board resolution and the blank form of the proposed severance agreement. Neither mentions Pane by name, and he never received a signed version containing his name. It is Pane, therefore, who must rely on parole evidence to establish that he was intended to be included as a plan participant. The district court did not credit the testimony he offered, on an issue on which he had the burden of persuasion. *See Gavalik v. Continental Can Co.*, 812 F.2d 834 (3d Cir.1987). The finding that he was not intended to be a plan participant is not clearly erroneous. Fed.R.Civ.P. 52(a).

 Pane contends that because of RCA's actions it should have been estopped from disputing that he was a plan participant. Liability based on promissory estoppel requires proof of representation and of reasonable detrimental reliance on that representation. *Rosen v. Hotel & Restaurant Employees & Bartenders Union*, 637 F.2d 592 (3d Cir.), *cert. denied*, 454 U.S. 898, 102 S.Ct. 398, 70 L.Ed.2d 213 (1981). The district court found no detrimental reliance on any RCA representation. Pane contends that he relied to his detriment when he

exercised his option to purchase 234 shares of RCA stock after receiving RCA's December 26, 1985 memorandum.

The exercise of the stock options, however, resulted in a gain of over $6,500. It was facilitated by a loan arranged by RCA, and the interest on that loan was paid by RCA. Pane contends that he suffered risk and anxiety over the risk associated with the investment. *See Vastoler v. American Can Co.*, 700 F.2d 916 (3d Cir.1983). The court did not credit this contention, finding that there was no volatility in the price of RCA stock after the merger agreement, that he could have sold the stock for a substantial gain at any time after exercising the option if he was in fact anxious, and that he retained both the option stock and an additional 149 shares of RCA stock for the full merger period. Moreover, there is no apparent nexus between the decision to exercise a stock option on favorable terms and the availability of a severance agreement. The court's rejection of Pane's anxiety over the exercise of his stock option as detrimental reliance sufficient to support a promissory estoppel was neither factual nor legal error.

Lastly, Pane urges that his continued employment at RCA was sufficient detrimental reliance to support a claim of detrimental reliance. He did not offer any testimony, however, that at any time he contemplated leaving RCA. Rather, he points out that RCA received the benefit of his continued services. That benefit is irrelevant to promissory estoppel. The issue is detriment to the promisee, not benefit to the promisor. *See* Restatement (Second) of Contracts, § 90 (1981).

## C.

### The Section 502(c) Request for Information

 Pane requested that the court assess penalties against RCA under 502(c). The district court denied this requested relief because nothing in the record established that Pane had requested any information about the plan to which he was entitled and which was not provided to him.

Pane notes that in the first week of January 1986 and again in May of 1986 he requested a severance agreement. That request for coverage was not, however, a request for information within the meaning of section 502(c). *Kleinhans v. Lisle Savings Profit Sharing Trust*, 810 F.2d 618, 622–24 (7th Cir.1987) (request for benefit rather than information does not fall within section 502(c)). When Pane inquired in January 1986 as to the reasons why he was not given a severance agreement he was informed that the reason was his job performance. Thus the district court did not err in denying Pane's request for the assessment of section 502(c) penalties.

## VI.

Pane's state law claims were properly dismissed because they are preempted by ERISA. His demand for a jury trial on his ERISA claims was properly stricken. His ERISA claim to be a participant was properly rejected. His claim for assessment of penalties under section 502(c) was also properly rejected. He does not on appeal pursue his retaliation claim. The judgment appealed from will, therefore, be affirmed.